UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHN M. HOOPER, II and      ]
JOHN M. HOOPER, III,        ]
TRUSTEES OF THE TENNESSEE WINE ]
& SPIRITS COMPANY INDIVIDUAL ]
ACCOUNT RETIREMENT PLAN,    ]
                            ]
     Plaintiffs,            ]
                            ]
v.                          ]      No. 3-08-01121
                            ]      JUDGE HAYNES
                            ]
ARCHIE ADAMS,               ]
                            ]
     Defendant.             ]

## M E M O R A N D U M

Plaintiffs, John M. Hooper, II and John M. Hooper, III, Trustees of the Tennessee Wine & Spirits Company Individual Account Retirement Plan, filed this action under §§ 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3) against the Defendant Archie Adams. Plaintiffs assert claims of breach of fiduciary duty, unauthorized distribution from the Individual Account Retirement Plan ("the Plan") and unjust enrichment. Plaintiffs seek return of the funds withdrawn by him on September 18, 2008, in the amount of $308,373 or, in the alternative, to reimburse the Plan the difference in the value of his account on December 31, 2007, and the value as of December 31, 2008, or $97,731.44. The Defendant filed a

counterclaim and asserts his right to the amount distributed to him on September 18, 2008.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 23), contending that because the Defendant was entitled to receive his account balance based on a December 31, 2007, valuation, the Plan did not suffer any damage or loss as a result of the Defendant's withdrawal of his retirement funds on September 18, 2008. Also, before the Court is Plaintiffs' motion for summary judgment (Docket Entry No. 28), contending that the Defendant unlawfully received a distribution from the Plan as he was still employed by Tennessee Wine & Spirits ("TWS") and that the Defendant should be ordered to return to the Plan the unlawful amount received by the Defendant.

For the reasons set forth below, the Court concludes that Defendant's motion for summary judgment should be granted and Plaintiffs' motion for summary judgment should be denied.

## I. FINDINGS OF FACT[1]

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Because there are not any material factual disputes, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

2

TWS is a Tennessee corporation engaged in the wholesale sale and distribution of alcoholic beverages in the middle Tennessee area. (Docket Entry No. 38, Defendant's Response to Plaintiffs' Statement of Undisputed Facts, at ¶ 1). The Defendant worked for TWS for approximately forty years and during the last several years of his employment held the position of Vice President-Finance and Operations of TWS. Id. at ¶ 2. The Defendant also served as one of the trustees and fiduciaries of the Plan and was also a participant in the Plan. (Docket Entry No. 36, Plaintiffs' Response to Defendant's Statement of Undisputed Facts, at ¶ 3). Plaintiff John ("Jack") M. Hooper, II served as a trustee of the Plan, and Plaintiff John M. Hooper, III served as president and chief operating officer of TWS. Id. at ¶ 4.

Pursuant to the Plan, a participant is entitled to receive a distribution of the participant's individual vested account balance upon separation from employment with TWS for any reason. Id. at ¶ 5. At the time of distribution, a participant's vested account balance is determined as of the most recent valuation date immediately prior to the distribution date, which is December 31 of the year preceding the year in which distribution occurs. (Docket Entry No. 38, at ¶ 8; Docket Entry No. 33, Affidavit of Susan Wasserman at ¶¶ 2-6).[2] Termination, for whatever the reason, does

_____

[2]There is a dispute as to whether the valuation date is December 31 of the year preceding the year in which distribution occurs or January 1 of the year in which distribution occurs. The

not change the valuation date of the terminated employee. (Docket Entry No. 40, John M. Hooper, III Deposition at pp. 100-01).

In May 2007, the Defendant began to have discussions with Plaintiffs about the Defendant's retirement plans and his continued employment with TWS. (Docket Entry No. 38, at ¶ 11). The Defendant turned 64 on October 9, 2008, and was seeking to retire early. Id. at ¶¶ 12-13. In June 2007 the parties came to a verbal agreement that the Defendant would retire September 30, 2008, yet receive a salary of approximately $175,000 through the end of 2008, as well as the end of 2009. (Docket Entry No. 40, John M. Hooper, III Deposition at p. 79; Jack Hooper Deposition at p. 22). The Defendant was also to receive his medical insurance through the end of 2009, and TWS was to contribute to the profit sharing plan through the end of 2009 as well. Id., Adams Deposition at pp. 24-27; John Hooper, III Deposition at pp. 78-79. Despite the Defendant's request, the agreement was not formalized into writing. Id., John M. Hooper, III Deposition at pp. 61, 80; Jack Hooper Deposition at pp. 29-29; Docket Entry No. 39, Adams Affidavit at ¶ 3.

The parties dispute what the nature and extent of the Defendant's involvement was to be with TWS after September 30, 2008. According to Plaintiffs, they believed that the Defendant

---

Court finds this dispute immaterial as the parties do not dispute the amount in controversy.

4

would continue to be an employee of TWS. Although Plaintiffs did not expect the Defendant to come into the office, they expected him to be available in a consulting capacity in the unlikely event that any questions arose. (Docket Entry No. 40, Jack Hooper Deposition at pp. 15, 17; John M. Hooper, III Deposition at pp. 78-79). John Hooper, III testified that under the agreement the Defendant was to be considered an employee of TWS in order for him to be eligible for the profit sharing plan and to receive medical insurance. Id., John M. Hooper, III Deposition at p. 81.

The Defendant, on the other hand, characterized the agreement as a "buy-out package" or "compensation for years of service to TWS" rather than compensation for continued employment. Id., Adams Deposition at pp. 17, 27, 51, 55-57; Docket Entry No. 39, Adams Affidavit at ¶¶ 3-4. According to the Defendant, his expectation was that he would retire on September 30, 2008, and would only give advice if telephoned by someone from TWS. Id., Adams Deposition at p. 51. The Defendant testified that after John Hooper made him the lucrative offer the Defendant alluded to John Hooper of the possibility of the Defendant taking another job in the future. Id., Adams Deposition at p. 56. Prior to September 18, 2008, neither party expressed any intent at voiding the agreement. Id., Adams Deposition at pp. 26-28.

On August 1, 2008, Michael Mullen was hired as the Defendant's successor as Director of Finance and Operations for TWS and was to

be trained for that position by the Defendant. (Docket Entry No. 38, at ¶ 29; Docket Entry No. 34 Mullen Affidavit at ¶ 2). On that same date, the Defendant emailed Susan Wasserman, a Defined Contribution Consultant who works with TWS's Plan, informing her that he was retiring on September 30, 2008, and requested that she forward the 2008 profit sharing annual report to Mullen and a copy of it to the Defendant's residential address. (Docket Entry No. 40, Adams Deposition at pp. at 57-58, attachment thereto, Exhibit No. 13 at 56-57; Docket Entry No. 33, Wasserman Affidavit at ¶¶ 1, 5). Because the allocation of the 2008 Plan year would not be completed until the first quarter of 2009 and since the Defendant would no longer be an employee of TWS at that point, Wasserman declined the Defendant's request and suggested that she provide an extra copy of the report to Mullen who could then provide the Defendant with a copy. Id., Adams Deposition at pp. 58-60, attachment thereto, Exhibit No. 13 at 56-57.

On August 18, 2008, John Hooper, III advised TWS employees via email the following, in part: "Effective immediately, and going forward, please direct all questions, needs, concerns, etc. to Mike [Mullen].... not to Archie. Archie will serve in a minor supporting role to Mike until his retirement on September 30. Mike now has full oversight and control of our finances and operations." (Docket Entry No. 38, at ¶ 30; Docket Entry No. 32, Exhibit No. 3).

6

In early August 2008, the Defendant made contact with Athens Distributing Company of Nashville ("Athens"), a direct competitor of TWS, regarding possible employment with that company. Id. at ¶ 34. The Defendant had made earlier contact with Athens in January 2008. (Docket Entry No. 40, Adams Deposition at p. 28). By letter dated August 12, 2008, the Defendant received an offer of employment for the position of Purchasing Manager of Athens. (Docket Entry No. 38, at ¶ 35). After further negotiations between the Defendant and Athens, Athens made a revised offer on August 18, 2008, and the Defendant accepted it by letter dated August 23, 2008. Id. at ¶ 36. The Defendant was to receive an annual salary of $75,000 and was to begin work at Athens on October 1, 2008, or sooner. (Docket Entry No. 40, Adams Deposition at pp. 28-29; attachment thereto, Exhibit No. 6 at 36). The Defendant was to remain on TWS's medical insurance plan and would apply to be added on Athens's medical insurance plan when his coverage under TWS expired. Id., Adams Deposition at p. 30; attachment thereto, Exhibit No. 6 at 38.

The Defendant did not notify Plaintiffs that he had been in negotiations with Athens and had accepted an offer of employment with Athens. (Docket Entry No. 38, at ¶ 42). The Defendant testified that he did not expect TWS to continue to pay him or keep him on its insurance once he went to work for Athens. (Docket Entry No. 40, Adams Deposition at pp. 30, 54). The Defendant

7

testified that he would have informed TWS of his employment with Athens at the "proper time," i.e., sometime around "the neighborhood of October." Id. at p. 33.

On September 18, 2008, the Defendant withdrew his share from the profit sharing plan in the amount of $476,492. (Docket Entry No. 36, at ¶ 8). Of that amount, $168,118.61 represented a rollover contribution that the Defendant was entitled to withdraw at any time. (Docket Entry No. 38, at ¶ 46). The value of the Defendant's account as of December 31, 2007, less the rollover contribution, was $308,373. Id. at ¶ 47. The amount the Defendant received on September 18, 2008, was the same amount he would have received had his employment terminated at any point in the 2008 calendar year. (Docket Entry No. 36 at ¶ 14). However, had the Defendant left employment with TWS in 2009 and taken his withdrawal anytime in 2009, the value of the Defendant's account balance as of a December 31, 2008, valuation, reflecting the pro rata share of the loss in the Defendant's balance in the "employer account" balance, would have been $210,642, or a difference of $97,731.44 less than the December 31, 2007, balance. (Docket Entry No. 33, Wasserman Affidavit at ¶ 4).

By letter sent on September 24, 2008, John Hooper, III terminated the Defendant, effective September 30, 2008, for violating his fiduciary duties and the express provisions of the

8

Plan. (Docket Entry No. 38, at ¶ 26). On October 1, 2008, the Defendant started work at Athens. (Docket Entry No. 36, at ¶ 11).

John Hooper, III testified that the Plan was not damaged by the Defendant's withdrawal in September 2008. Id. at ¶ 15. However, Plaintiffs assert that as a result of the Defendant's alleged premature and unauthorized withdrawal other participants in the Plan were damaged as a result of their reduction in their shares by the pro rata difference in the value of the Defendant's distribution based on the December 31, 2007, valuation versus the December 31, 2008, valuation. Wasserman attests that had the Defendant foregone his withdrawal in 2008 and left his money in the Plan through December 31, 2008, his "employer account" balance would have received a pro rata share of the 2008 investment losses that occurred in the pooled trust accounts and, because the Defendant withdrew his balance in 2008 and avoided these losses, the other Plan participants received a larger share of the losses than they would have had the Defendant's account shared a portion of the loss. (Docket Entry No. 33, Wasserman Affidavit at ¶ 6).

## II. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to

9

possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita Electrical Industrial Co.

10

v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926

11

F.2d 524, 526 (6th Cir. 1991)(quoting <u>Kochins v. Linden-Alimak,</u> <u>Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" <u>Emmons</u>, 874 F.2d at 353 (quoting <u>Celotex</u> and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting <u>Liberty Lobby</u>). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

<u>Street</u>, 886 F.2d at 1480 (citations omitted). <u>See also</u> <u>Hutt v.</u> <u>Gibson Fiber Glass Products</u>, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting <u>Liberty Lobby</u>).

12

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.
>
> . . . .
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."</u>

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

> It is likewise true that:
>
> In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The

13

purpose of the hearing on the motion for such a judgment
is not to resolve factual issues.   It is to determine
whether there is any genuine issue of material fact in
dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427

(6th Cir. 1962) (citation omitted).   As the Court of Appeals

stated, "[a]ll facts and inferences to be drawn therefrom must be

read in a light most favorable to the party opposing the motion."

Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role

in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which
> portion of the record the nonmoving party relies, nor is
> it obligated to wade through and search the entire record
> for some specific facts that might support the nonmoving
> party's claim.   Rule 56 contemplates a limited
> marshalling of evidence by the nonmoving party sufficient
> to establish a genuine issue of material fact for trial.
> This marshalling of evidence, however, does not require
> the nonmoving party to "designate" facts by citing
> specific page numbers.   Designate means simply "to point
> out the location of."   Webster's Third New InterNational
> Dictionary (1986).
>
> Of course, the designated portions of the record must be
> presented with enough specificity that the district court
> can readily identify the facts upon which the nonmoving
> party relies; but that need for specificity must be
> balanced against a party's need to be fairly apprised of
> how much specificity the district court requires.   This
> notice can be adequately accomplished through a local
> court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).

Here, the parties have given some references to the proof upon

which they rely.   Local Rules 56.01(b)-(d) require a showing of

undisputed and disputed facts.

14

In _Street_, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

15

> 9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> 10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Plaintiffs contend that the Defendant breached his fiduciary duty when the Defendant, while still employed by TWS and who had allegedly agreed to stay employed by TWS through 2009, withdrew his funds in September 2008 based on the December 31, 2007, valuation. Plaintiffs contend that this unlawful withdrawal in 2008 damaged the other participants in the Plan because those participants received a larger share of the losses than they would have

16

experienced had the Defendant withdrawn his funds in 2009 based on the December 31, 2008, valuation when he would have been eligible to do so.

The Defendant contends that the parties did not have an enforceable agreement for the continued employment of the Defendant through 2009 and Plaintiffs have failed to show that the Plan suffered a loss and that the Defendant profited from any alleged breach of fiduciary duty.

The duties of a fiduciary are described in 29 U.S.C. § 1104(a)(1), which provides, in part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries . . .
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> . . .
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

Id.

Under 29 U.S.C. § 1106, a fiduciary is prohibited from engaging in certain transactions. Section 1106(a)(1)(D) provides:

17

"A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--transfer to, or use by or for the benefit of a party in interest,[3] of any assets of the plan."  Also, § 1106(b)(1) states, "A fiduciary with respect to a plan shall not--deal with the assets of the plan in his own interest or for his own account."

A fiduciary may be held personally liable for a breach of fiduciary duty.  Title 29 U.S.C. § 1109(a) provides the following:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. . . .

Id.  Moreover, 29 U.S.C. § 1132(a)(3) provides that a participant, beneficiary or fiduciary is empowered to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . ."

---

[3] A "party in interest" "means, as to an employee benefit plan--any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan[.]" 29 U.S.C. § 1002(14)(A).

18

To be sure, unlike the law of trusts, ERISA permits a plan fiduciary to wear "two hats" and "a fiduciary may have financial interests adverse to beneficiaries." Pegram v. Herdrich, 530 U.S. 211, 225 (2000). ERISA, however, requires "that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." Id. Therefore, "the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." Id. at 226.

## A. BREACH OF FIDUCIARY DUTY

Plaintiffs' contention that the Defendant's alleged breach of fiduciary duty caused the other participants in the Plan to suffer a loss presupposes that the Defendant was required to stay employed by TWS through 2009. The Defendant, as a fiduciary, was allowed to participate in the Plan, and it is undisputed that the funds that the Defendant withdrew were his own. The only way that Plaintiffs can prove loss to the Plan is if the Defendant were only eligible to withdraw his funds based on a December 31, 2008, valuation instead of a December 31, 2007, valuation. Thus, the crux of Plaintiffs' argument hinges on the parties' oral agreement.

The parties dispute whether the agreement was for continued service of employment or for compensation for years of service.

19

The resolution of this dispute is immaterial as there was no legal binding agreement under the Statute of Frauds. See Tenn. Code Ann. § 29-2-101(a)(5).[4] Nor do Plaintiffs assert that there was an enforceable contract between the parties. Thus, because the Defendant was not under a contractual obligation to stay employed with TWS through 2009, the Defendant was able to leave TWS at anytime for any reason, whether through termination, resignation or retirement.

The evidence reveals that the Defendant had made contact with Athens as far back as January 2008, negotiated with Athens throughout August 2008, and formally accepted an offer from Athens on August 23, 2008, to begin working there no later than October 1, 2008. The Defendant indicated to Wasserman, the Plan's consultant, that he was retiring on September 30, 2008, and John Hooper, III's August 18 2008, email stated that the Defendant would be retiring

---

[4]Tennessee Code Ann. § 29-2-101(a)(5) states that:

(a) No action shall be brought:

. . .

> (5) Upon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract; unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party. . . .

Id.

20

on September 30, 2008, and directed all subsequent inquiries to Mullen, the Defendant's replacement. The only thing holding the Defendant beyond that date is Plaintiffs' reliance on an unenforceable agreement. While the Defendant was still employed by TWS on September 18, 2008, and was in technical violation of the Plan's terms prohibiting withdrawal of funds while still an employee of TWS, the fact remains that this violation of the Plan's terms did not result in any losses under 29 U.S.C. § 1109(a) as the Defendant could have withdrawn his funds at the December 31, 2007, valuation anytime after his retirement on September 30, 2008, up until December 31, 2008.

Because there is not any proof that the Defendant was under a contractual obligation to remain employed by TWS through 2009, the Defendant was free to resign or retire at anytime in 2008 and would have been eligible to receive his funds at the December 31, 2007, valuation. Therefore, Plaintiffs have not proved under § 1109 that the Defendant breached any fiduciary duty on September 18, 2008, or caused losses to the Plan.

Accordingly, for the reasons stated above, the Court concludes that Plaintiffs' claims under 29 U.S.C. §§ 1104, 1106, and 1109 and their request for equitable relief under 29 U.S.C. § 1132(a)(3) fail.

### B. UNAUTHORIZED DISTRIBUTION AND UNJUST ENRICHMENT

21

The Defendant contends that neither Tennessee nor federal law recognizes "unauthorized distribution." The Defendant also contends that, similar to the breach of fiduciary duty claim, Plaintiffs have failed to present evidence that the Defendant received any money to which he was not entitled. Likewise, as to Plaintiffs' claim of unjust enrichment, the Defendant contends that he did not receive a benefit that would be inequitable for him to retain by his withdrawal of his share of the profit sharing funds on September 18, 2008. Plaintiffs did not address these individual claims in their response to the Defendant's motion for summary judgment.

The Court's analysis on Plaintiffs' breach of fiduciary claims applies to these claims as well. For the same reasons, the Court concludes that Plaintiffs' "unauthorized distribution" and unjust enrichment claims lack merit.

### III. CONCLUSION

Accordingly, the Defendant's motion for summary judgment (Docket Entry No. 23) should be granted, and Plaintiffs' motion for summary judgment (Docket Entry No. 28) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _22nd_ day of March, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

22